UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-vs-

                                        16-CR-140

JOSEPH LOMBARDO,

                    Defendant.

## SENTENCING MEMORANDUM

JOEL L. DANIELS, ESQ.                JUSTIN GINTER, ESQ.
OFFICE & P.O. ADDRESS                Lipsitz Green Scime & Cambria, LLP
42 Delaware Avenue, Suite 700        42 Delaware Avenue
Buffalo, New York 14202              Buffalo, New York 14202
(716) 856-5140                       (716) 849-1333
jdaniels38@aol.com                   Jginter@lglaw.com

### Attorneys for Defendant

TO:   Aaron J. Mango, Esq.
      Assistant United States Attorney
      United States Attorney's Office
      138 Delaware Avenue
      Buffalo, New York 14202

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-vs-

16-CR-140

JOSEPH LOMBARDO,

          Defendant.

---

## **Introduction**

Defendant, Joseph Lombardo, is scheduled to be sentenced before this Court March 7, 2017 at 10:00 a.m.  Defendant earlier plead guilty to possession of Child Pornography, (18 U.S.C. 2252(a)(5)(b)); Receipt of Child Pornography, (18 U.S.C. 2252(A)(a)(2)(A) (two counts)).  Mr. Ball's PSR calculates a total offense level of 36, Criminal History I, (188 - 235 months).  (18 U.S.C. 2252(A)(a)(2)(A), Receipt of Child Pornography, requires a five year minimum.) Paragraph 20 of Defendant's Plea Agreement allows Defendant to request a sentence outside the guideline range.

2

## **Personal History and Background**

Born with a deformed left arm, suffered during a botched delivery, Defendant is 25 years old.  (See, PSR ¶121, p.22) Following his parents' divorce when he was two, Defendant was raised by his hard-working mother and step-father.  Defendant's mother, Cheryl Calire, 56, works for the Catholic Diocese of Buffalo; Ms. Calire is very active in the Diocese's pro-life movement.  Defendant's step-father, David Calire, has been a music teacher at the Buffalo Public Schools for over twenty years. An accomplished musician, including piano and trumpet, Mr. Calire teaches choral and general music to students at DeVinci (next to D'Youville), and Newcomer Academy  (refugee and immigrant students, formerly Lafayette High School). Currently the Calire's reside in the refurbished rectory at 208 Stanislaus Street, next door to the St. Adalbert's Basilica.

Further details concerning Defendant's family history and personal information are accurately described in Mr. Ball's PSR.  (See PSR, ¶¶ 111-119; pp. 20-22)

### Crystal McManus: Justin

Attending a Catholic school dance when he was 15, Defendant met – by chance – Crystal McManus, a young lady from Cheektowaga.  Ms. McManus was then 15 years old.  (See PSR ¶116, p. 21)  They became "involved"; she was soon pregnant. Ms. McManus was 15 years old when she gave birth to Defendant's son Justin. Maintaining contact with his young son and her mother (although her parents were not too happy with him), Defendant even arranged for joint custody, making sure he saw his son several times a week.

When Justin was four years old, Crystal's parents "kicked her out of the house."  Defendant welcomed both Crystal and Justin to share his modest Broadway Avenue apartment.  (Interesting that Crystal chose to move in with Defendant, for a year, following Defendant being granted an ACD after he was charged with violating a protective Order for sending text messages to Crystal.)  (See PSR ¶17, p. 93)  When Crystal left, returning home to her parents, she agreed to Justin living with Defendant during the week, reserving only weekend visitation for herself.  Although a teenager, Defendant developed a close relationship with Justin and became a responsible father.

4

Since Defendant's arrest, February 9, 2016, Justin, then a fifth grade student, has lived with his mother and her parents.  (Defendant did not oppose Crystal's petition for permanent custody.)

## **Work History**

School was not easy for the Defendant.  A special education student, placed in 504 Accommodation Plan and diagnosed with ADHD, Defendant chose to leave school when he was 17 (10th grade) and start working full time.  (See PSR ¶127-130, pp. 23-24)

A diligent worker and self-starter, Defendant washed dishes at Ted's, delivered pizza; worked security at Geico and ECMC; sold cell phones at Best Buy for $9.00 an hour, before finding a well paying job at AT & T selling smart phones and tablets. (See PSR, ¶¶131-134, p 24)

Finding his niche, Defendant became a top salesman for a local AT & T store. Paid $12 an hour, he was entitled to commissions after reaching his $12,000 sales goal.  For example, in 2015, Defendant earned over $50,000 selling AT& T phones

and tablets.  (According to Defendant, the top local salesman earned $70,000; Defendant, number two in sales, was not far behind.)

This shows that Defendant, who chose to leave school early, was able to overcome his learning obstacles and make efforts to start a successful career.

## Offense Conduct
### "Electronic Environment"

Think no more about what was considered traditional dating.  Everything has changed now.  Welcome to the digital world of the internet where old fashioned meet-ups are now just a click away.  This phenomenon is dramatically explained in the recent best seller, "American Girls"[1]. (See "American Girls", Nancy Jo Sales, Alfred J. Knopf, 2016) Award winning author, Nancy Jo Sales, in describing the digital habits of 13 - 19 year olds, "captures what the intersection of social media, sexism, and internet porn is doing to an entire generation of women."  (See, American Girls, flyleaf, back cover.)

---

[1]   Copies of Ms. Sales' book have been provided to Mr. Mango and Mr. Ball.

6

The book's flyleaf insert explains it best:

> "American Girls provides a disturbing portrait of the end
> of childhood as we know it and of the inexorable and
> ubiquitous experience of a new kind of adolescence - one
> dominated by new social and sexual norms, where a girl's
> first crushes and experiences of longing and romance occur
> in an accelerated electronic environment; where issues of
> identity and self-esteem are magnified and transformed by
> social platforms that provide instantaneous judgment.
> What does it mean to be a girl in America in 2016?  It
> means coming of age online in a hypersexualized culture
> that has normalized extreme behavior, from pornography
> to the casual exchange of nude photographs; a culture rife
> with a virulent new strain of sexism and a sometimes self-
> undermining notion of feminist empowerment; a culture in
> which teenagers are spending so much time on technology
> and social media that they are not developing basic
> communication skills.  From beauty gurus to slut-shaming
> to disconcerting trend of exhibitionism, Nancy Jo Sales
> provides a shocking window into the troubling world of
> today's teenage girls."

For a 13 year old girl, sending a nude picture of herself is now easy.  Just take
the picture in the privacy of your bedroom/bathroom, hit "KIK" on your smart phone
and it's on its way without her parents having any idea.

The undersigned are not in any way blaming these three young victims who
shared nude pictures of themselves with Defendant.  Nor does counsel attempt, in any
way, to mitigate Defendant's conduct.  Respectfully, the undersigned believe the

Court should recognize how young teenage girls are becoming involved in this digital cultural revolution.  At least it allows the Court to examine the full social picture we are dealing with.


## **Victims**

MeetMe.com is a favorite digital media site popular with young teenage girls.  There are other web sites, e.g., MySpace, or TeenSpot.  But they are not private (at least that is what the undersigned have been told).  In other words, parents can check those sites.


MeetMe.com is private. (See PSR ¶49, pp. 12-13.)  A young lady simply clicks on this site, fills out her dating profile with her age, actual or otherwise, and includes, if she wishes, suggestive pictures of herself moderately clothed, of course.  The young lady's profile usually describes dating habits as well as sexual preferences and experience (again real or imagined).  MeetMe.com profiles are organized by age allowing someone to "troll" or search by claimed age group.


Again, although Mr. Ball's PSR is generally accurate in describing the offense (¶¶18-35, pp. 6-10), additional information may be helpful.

For example, the first young lady, states she was 13 when she had initial digital contact with Defendant. This occurred "three or four years" ago, (PSR ¶20, p. 6) when Defendant was 19/20. They "met" through MeetMe.com. However, this young lady's profile and claimed age have not been provided. At first, they texted back and forth, but no pictures were exchanged. One/two years later, the digital relationship was renewed. It was believed that this young lady was then 15. Pictures were exchanged, including nudes. (According to Defendant, no more than 15/20 pictures were exchanged.)

Defendant admits he used aliases, including Chris, or "Dan," even sending pictures of another "handsome" person to this young lady. Soon, they met, and as reported, had sex several times in Defendant's apartment. No pictures of this young lady, including nude photos were ever send to anyone or posted on Facebook or any other site by Defendant. Further, the Government informed Mr. Ball that forensic evidence was insufficient to prove the nude photos of this young lady possessed by Defendant were either solicited or produced by him. (See PSR ¶27, p. 8).

It is noted in May 2014, that this incident was reported to the Lancaster Police by this young lady. A search warrant was quickly obtained and Defendant's

apartment searched.  According to Defendant, sheets, pillow cases, wash cloths and all computer equipment was removed.  Defendant was not arrested until February 2016, 1½ years later.  It is assumed the evidence removed from his apartment was reviewed by the Erie County District Attorney's Office, Special Victim's Bureau. But for reasons unexplained to the undersigned, Defendant was never charged with any State offense.

The second young lady, (PSR ¶31, p. 9), also profiled herself on MeetMe.com. Her profile information has not been given to Counsel.  A texting relationship developed, and according to Defendant, this young lady did send nude photos of herself.  The pictures most likely taken by herself, on her phone, were sent to defendant using the "KIK" app on her phone.

Defendant and the third young lady, after "meeting five years ago over MeetMe.com," engaged in a dating relationship for almost a year.  At that time, the undersigned believe this young lady was 16 years old; Defendant was then 20. According to Defendant, he used his name Joseph Lombardo.  Defendant would routinely pick up this young lady.  They hung out, and on occasion had consensual sex in his apartment.  This young lady was interviewed by Mr. Ball.  She had every

opportunity to be open and candid.  There is no reason for her to be anything but truthful.  In her response, this young lady stated to Mr. Ball:

> "I never felt like I was being taken advantage of or any of it was forced.  I felt like we were in a relationship.  I never felt threatened or like I had to do something that I didn't want to do.  I felt it was a mutual decision to end the relationship and we even remained friends after the break up . . . I always felt like he was a friend and someone I could confide in.  I never felt like a victim. "

See PSR ¶47, p. 12

Defendant knows he took advantage of these vulnerable young ladies.  This was not how he was raised.  He makes no excuse; he knows how easy it was to meet young ladies in this digital world, where smart phones, apps, texting and meet-up sites are the new world.  In hind sight he clearly recognizes, without question, that he used very poor judgment.

**Angela Calire: Step-Sister**

Angela Calire claims Defendant repeatedly sexually abused her, at a young age, while their blended family lived together in her father's home.  The undersigned has investigated and reviewed these claims carefully, and do not believe Ms. Calire is truthful.  More to the point, these alleged incidents never happened.  (See PSR, ¶¶94,

11

95; pp. 17, 18).

The undersigned did speak to Mr. Ball, asking him to remove these paragraphs referencing Ms. Calire's claims and accusations. Recognizing Mr. Ball's obligation, he said he could not.

These paragraphs (¶¶ 94, 95) were reviewed with Ms. Calire's natural father, David Calire. Mr. Calire has been married to defendant's mother over 20 years. Mr. Calire has a Bachelor's in Science Education, a Master's degree in Teaching Leadership and a Master's degree in Music. He has been a certified teacher with the Buffalo Board of Education since 1997. In 2014, he was a recipient of the Pro Vita Award.

Mr. Calire challenges his daughter's claims. In his opinion, simply put, she lied. (Never easy for a father to accuse his daughter of being untruthful).

Attached is an email dated February 2, 2017 from Mr. Calire, which was forwarded to Mr. Ball, and included in Mr. Ball's revised PSR (¶98, p.18) requesting that he include Mr. Calire's comments in his PSR. (Exhibit A)

In determining whether Ms. Calire was truthful, the full background of this family may be helpful to the Court. David Calire's ex-wife is Mary Lynn Walsh. He and his ex-wife had a bitter and antagonistic divorce. Mr. Calire describes her as "vindictive and unpleasant." (Not unusual of course in tough divorce cases.) According to Mr. Calire, his ex-wife would do anything to "harm Defendant's family."

David Calire and Mary Lynn have two children, Angela and Andrew. Following the divorce, the children were living with their mother Mary Lynn in Kenmore. On the weekends, both children would visit with David and his wife Cheryl. David was unaware of any inappropriate conduct, as described by Angela, allegedly occurring in the house. Any claim of abuse was a surprise to Mr. Calire. Assumedly, Mary Lynn reported that her daughter complained to her about an incident with defendant. A teacher and concerned father, David Calire accompanied his stepson to Family Court, along with his wife Cheryl. In fact, defendant does recall going there on one occasion. According to Mr. Calire, *Angela admitted to Family Court counselors that this incident never happened.* (emphasis supplied). No Petition was ever filed; according to David, everything was dismissed.

13

In the meantime, David Calire filed a petition for full custody. During this difficult litigation, the appointed law guardian spoke to both children, Angela and Andrew. Interestingly, both told the guardian they no longer wanted to live with their mother and instead, chose to reside with their father. When Angela was 13 / 14, she left her mother and then moved in with her father, who had custody over both her and Andrew. She stayed with the Calire family until she was 18. Defendant left the home when he was 17.

According to David Calire, Angela never complained to him or as far as he knew, to anyone else about Defendant. This was a 4,000 square foot home. Mr. Calire resided there with his wife Cheryl, David's elderly mother and uncle Herman, (who recently died at 92). They celebrated birthdays and holidays together, went to church, and took two family vacations, including trips to Disneyland.

Importantly, David Calire as a Buffalo School teacher and sensitive to these issues, is on the record that he never saw anything that caused him to be suspicious of his stepson's relationship with Angela. The bottom line: Everyone got along, there was never a problem and never a complaint.

14

Respectfully, the undersigned asks the Court to consider the above in determining whether to give any weight or credence to Ms. Calire's story.

## Dr. Michael E. Rutter, Ph.D.

Dr. Rutter, an experienced Sexual Offender Evaluator, at the request of the undersigned, interviewed Defendant January 20th and 23, 2017 at Niagara County Jail.  Dr. Rutter was asked to conduct a sexual offender evaluation of Defendant and forward a report of his findings and conclusions.  (See Exhibit B, Dr. Rutter's Report, February 6, 2017.)

Following his review of available materials, including Mr. Ball's PSR, Dr. Rutter administered standard psychological tests, Minnesota Multiphasic Personality Inventory-2 (MMPI-2_ and Millon Clinical Multiaxial Inventory-III (MCMI-III).  He also used actuarial risk assessment tools including the Minnesota Sex Offender Screening Tool-Revised (MnSOST-3.1).  (See Dr. Rutter's report, pp. 6-7, explaining the clinical importance of administering these tests.)

After analyzing the test results and associated risk factors, Dr. Rutter opined:

> ". . . [Defendant] does not suffer from
> antisocial personality disorder, psychopathy,
> or impulse control difficulties.  He is not a
> danger to himself or others. [Defendant]
> does not have sexual urges or fantasies
> involving children, does not appear to have
> an interest in child pornography, and does
> not exhibit symptoms consistent with
> pedophilic disorder."

Dr. Rutter continues:

> "[Based on my evaluation] I categorize
> [Defendant] as a below average risk for
> engaging in inappropriate contact with a
> child.
> . . . [Defendant's] absence of major mental
> illness and his scores on pertinent risk
> factors make him more likely to achieve a
> successful outcome from sexual offender
> treatment and less likely to re-offend."

See Dr. Rutter's Report p. 6, 7

Dr. Rutter, an experienced psychologist, has conducted hundreds, if not
thousands, of patient assessments.  He deals daily with people suffering from mental
disease, personality problems and sexual offender issues.  Dr. Rutter is often called
upon to evaluate defendants facing sexually related charges including possession of
child pornography or sexually explicit materials.  The undersigned ask the Court to
give due consideration to Dr. Rutter's evaluation and opinion.

## **Acceptance of Responsibility**

Foolish and ashamed, Defendant regrets his actions.  Although only 19/20, he should have known better.  As a responsible parent to young Justin and raised by a mother of strong faith, he knows this was all his fault.  He admits he took advantage of these vulnerable ladies whose choice to explore the digital "meet-up" world did not work out well.  In his letter to the Court, Defendant explains:

> "I want you to know how very sorry I am for the victims in this case.  I took advantage of these young girls.  I blame no one but myself.  I was selfish, used bad judgment and was not thinking about anyone but myself.  I should have acted like an adult instead of acting childish and forgetting who I am and how I was raised."

Joseph Lombardo
January 17, 2017[2]


Defendant has affirmatively accepted responsibility for his conduct.  He was fully cooperative with Mr. Ball when interviewed about his admitted offenses.

(See PSR ¶¶ 49-53, pp. 12, 13)

---

[2] See Exhibit C, Defendant's letter to the Court; See Exhibit D, 31 letters submitted in support of Defendant from friends and family.

## Conclusion

Defendant faces a potentially severe sentence (188-235 months). Respectfully, the undersigned do not believe that Defendant's conduct, although not admirable even by today's standards, requires or deserves such excessive punishment. Sentenced to the custody of the Bureau of Prisons, Defendant will be placed in a facility carefully monitored with mandated restrictions for sexual offenders. When released, (whenever that may be), Defendant will be on Supervised Release requiring him to comply with special conditions of sexual offender probation. In addition, Defendant will be registered as a sexual offender.

Defendant is now 25 years old. He has no record of any criminal convictions. He is the father of a 10 year old son whom he helped to raise. As such, the guidelines may present an unrealistic punishment for Defendant's admitted conduct. Simply put, the sentence advocated by the government may be far more than necessary to accomplish the goals of fair, reasonable and just sentencing. (See 18 USC §3553(a)).

Importantly, Dr. Rutter an experienced and respected Psychologist, does not believe Defendant suffers from mental illness, nor is he a danger to young

18

children, or importantly, Defendant possesses the risk to re-offend.

Defendant's Plea Agreement allows consideration of a non-guideline sentence. Respectfully, the undersigned ask the Court to use its discretionary sentencing authority and sentence Defendant accordingly.

Dated: Buffalo, New York
        February 13, 2017

    _/s/ Joel L. Daniels_                _/s/ Justin Ginter_     
JOEL L. DANIELS, ESQ.               JUSTIN GINTER, ESQ.
OFFICE & P.O. ADDRESS        Lipsitz Green Scime & Cambria, LLP
42 Delaware Avenue, Suite 700    42 Delaware Avenue
Buffalo, New York 14202          Buffalo, New York 14202
(716) 856-5140                    (716) 849-1333
jdaniels38@aol.com               Jginter@lglaw.com

***Attorneys for Defendant***

19